## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHWESTERN DIVISION

KENNETH BRICKER,        )
                                     )
        Plaintiff,         )
                                     )
        v.                 )     Case No. 09-CV-05043-NKL
                                     )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,  )
                                     )
        Defendant.       )

## ORDER

Plaintiff Kenneth Bricker ("Bricker") challenges the Social Security Commissioner's ("Commissioner") denial of his claim for disability insurance benefits. This lawsuit involves an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433 and under Title XVI for supplemental security income.

Bricker's initial application was denied, and he appealed the denial to an administrative law judge ("ALJ"). After administrative hearings were held on July 19, 2008 and September 11, 2008, the ALJ found that Bricker was not "disabled" as that term is defined in the Act. After considering additional evidence, the Appeals Council denied Bricker's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

Bricker argues that the record does not support the ALJ's finding that he was not

under a disability because (1) the ALJ did not properly evaluate the opinions of treating medical sources; (2) the ALJ did not provide a proper Residual Functional Capacity ("RFC") evaluation; and (3) the ALJ's decision at step 5 of the sequential process was not based upon substantial evidence. Because this Court finds no reversible error in the ALJ's decision, Bricker's Complaint [Doc. # 3] is denied.

## I.    Factual Background

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] At the time of the hearing, Bricker was thirty-six years old with an eleventh grade education and a GED. Bricker's past work primarily included building material sales attendant, auto service station attendant, cabinet assembler, cashier, and parts clerk. Bricker alleges that he became disabled on or about November 1, 2004.

Bricker claims he became disabled because of degenerative disc disease with back and radicular hip pain, fibromyalagia syndrome, left epicondylitis or tennis elbow, bipolar affective disorder, obsessive-compulsive disorder, a personality disorder, and depression.

### A.    Medical Records

On April 23, 2004, Bricker had an MRI of his lumbar spine, showing a mild disc protrusion. Although Bricker claims disability from November 1, 2004, the next medical records are from January 2006. Bricker was seen on January 17, 2006, by John R. Forsyth,

---

[1] Portions of the parties' briefs are adopted without quotation designated.

M.D. ("Dr. J. Forsyth"), Bricker's treating physician. Dr. J. Forsyth noted that Bricker had muscle spasms in his lower back and was tender to palpitation. Dr. J. Forsyth noted a normal gait and straight leg raising. Dr. J. Forsyth's mental status examination was within normal limits. He diagnosed chronic low back pain, lateral epicondylitis, and hypertension and prescribed pain medications and offered injections for Bricker's elbow pain.

On January 24, 2006, Dr. Robert Forsyth ("Dr. R. Forsyth"), a licensed psychologist, conducted a one-time psychological evaluation of Bricker. He noted that Bricker had racing thoughts in addition to anger, attention, and concentration problems. In addition, Bricker showed manic tendencies and obsessive compulsive behavior and thoughts. Dr. R. Forsyth noted Bricker was contradictory in reporting his symptoms by stating he had lost interest in things but then also stating he was "all for making [himself] a better person." Bricker admitted that his pain was not necessarily physical but more emotional. Dr. R. Forsyth administered multiple psychological tests. He noted problems with memory and mental focus and diagnosed Bipolar Mood Disorder Type II, Obsessive Compulsive Disorder, Nicotine Abuse, and ruled out Substance Abuse NOS, Adult Attention Deficit Disorder, and Personality Disorder, Mixed. He assessed a Global Assessment of Functioning score of 51[2] and recommended individual therapy, relationship intervention, and medication supervision.

_____

[2]The GAF scale represents a clinician's judgment of an individual's overall level of functioning. It is to be rated with respect to psychological, social, and occupational functioning, and should not include physical or environmental limitations. A GAF score of 51 to 60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficultly in social, occupation, or school functioning (e.g., few friends, conflicts with peers or coworkers). *See Diagnostic and Statistical Manual of Mental Disorders*, 32, 34 (4th ed. text revised 2000) (DSM-IV-TR).

On February 14, 2006, Bricker returned to Dr. J. Forsyth reporting worsening pain in his left elbow and back. Bricker's mental status was within normal limits. Dr. J. Forsyth diagnosed chronic pain, GERD, and obsessive compulsive disorder and changed Bricker's pain medication. On March 14, 2006, Dr. J. Forsyth noted that the change in pain medication was helping but not enough, and ordered a new MRI of the lumbosacral spine, and wrote a prescription for the pain.

The MRI was performed on March 27, 2006. On April 11, 2006, Dr. J. Forsyth reviewed the MRI results with Bricker, diagnosed chronic lumbar disc disease and left tennis elbow, provided a referral to neurosurgery for the back pain, and discussed a steroid injection for the elbow. Bricker was given the steroid injection on April 18, 2006.

On May 17, 2006, Bricker saw Dr. Sami Khoshyomn, a neurosurgeon, for evaluation of his back condition. Bricker told Dr. Khoshyomn that he had a long history of back pain, going back to 1990 and stated that he was only taking over-the-counter pain medications. Dr. Khoshyomn noted that the recent MRI showed degenerative disc disease at multiple levels within the lumbar spine. Dr. Khoshyomn told Bricker that due to his young age, he felt that a lumbar fusion should be a last resort, although he could be a candidate for surgical intervention if other methods failed. He referred Bricker to the Pain Center for a comprehensive evaluation and treatment, and gave him prescriptions for pain medication.

On June 1, 2006, Bricker saw Dr. Benjamin Lampert at the Pain Center. Upon physical examination, Dr. Lampert noted a normal gait, normal ability to heal and toe walk, negative straight leg lifting, good range of motion in the knees and ankles, and a 50%

reduced range of motion in the lumbar spine.

Dr. Lampert diagnosed possible facet syndrome, lumbar spondylosis without myelopathy, lumbar degenerative disc disease, annular tear with probable discogenic pain, and atypical Scheuermann's disease with thoracic degenerative disc disease. He recommended facet blocks and possible facet neurotomy procedure, with epidural steroid injections if the facet injections were not successful. The facet joint nerve blocks were performed on June 8, 2006, and did not result in substantial relief of Bricker's pain. An epidural steroid injection was planned for the next visit.

On June 20, 2006, Bricker saw Dr. J. Forsyth, reporting that he had good results from the nerve injection. Bricker complained of a cough and cold and continued back pain but had no other complaints. Bricker's mental status was within normal limits. Dr. J. Forsyth diagnosed chronic back pain, left lateral epicondylitis-improved, seasonal allergies, and depression, for which he prescribed medication for allergies and an anti-depressant and provided a referral for mental health treatment at the Clark Center.

Bricker was seen by a psychologist at the Clark Center on July 7, 2006, and diagnosed with Major Depressive Disorder, recurrent, moderate, Generalized Anxiety Disorder, and Alcohol Abuse, and assessed a GAF score of 60. He was scheduled for individual psychotherapy.

On July 10, 2006, Bricker returned to Dr. Lampert, who noted that he continued to have lower back pain with radiation into the left hip and partially down the left leg. He noted that Bricker had severe degenerative disc disease with left-sided lumbar radicular pain, and

recommended an epidural steroid injection. The injection was administered the following day. On July 25, 2006, Bricker received another epidural steroid injection. When Bricker returned on August 10, 2006, Dr. Lampert noted that he had not had any improvement from either the two epidural injections or the facet nerve block and recommended that he undergo pre-surgical psychological consultation, then return to discuss a possible discography.

On August 8, 2006, Bricker saw Dr. J. Forsyth for increased pain in his left elbow and seasonal allergies. Dr. J. Forsyth noted that the first injection provided three to four months' improvement and scheduled Bricker for a new injection for the left lateral epicondylitis. This injection was given on August 22, 2006.

On September 21, 2006, Dr. Lampert noted that Bricker was having generalized pain in all four extremities, in addition to his back, with tenderness in all fibromyalgia tender points. Dr. Lampert diagnosed fibromyalgia syndrome and recommended conservative treatments, including muscle relaxants, anti-inflammatory medications, and either anti-convulsant and/or anti-depressant medications for his pain. Dr. Lampert did not recommend further interventional treatment.

On October 3, 2006, Dr. J. Forsyth examined Bricker and noted soft tissue tenderness and pain at multiple sites. Dr. J. Forsyth provided Bricker with a prescription for a muscle relaxant for his fibromyalgia, in addition to diagnosing allergic rhinitis.

On September 19, 2006, Bricker was seen for counseling with regard to his history of alcohol abuse. At that time, he reported he was not drinking very much alcohol anymore. He was discharged from treatment at the Clark Center on February 1, 2007, due to failure to

participate in treatment.

On October 2, 2006, Bricker was seen by Dr. Eva Wilson, a psychologist for a pre-surgical psychological consultation. Dr. Wilson diagnosed social anxiety, obsessive compulsive disorder, and depression, as well as noting that Bricker had mood swings approximately once a week and had planned suicide two weeks ago. Bricker saw Dr. Wilson again on October 9, 2006 for a therapy session. Wilson's notes consisted of Bricker's subjective complaints and his reports of prior diagnoses and medications. She did not review any medical records and did not see Bricker again after these two visits.

On December 8, 2006, Bricker was admitted to the hospital after intentionally overdosing on muscle relaxants and drinking several alcoholic beverages in what was determined to be a suicide attempt. His diagnosis when he was discharged that same day was depression, and he was restarted on his depression medication.

Bricker was seen by Dr. Benjamin Leavitt on December 13, 2006, for follow up to the overdose and was noted to have manic symptoms including excessive spending, flight of thoughts, and elevated mood. Bricker stated that he was taking medication for his allergies, heartburn, and mental impairment but he was not taking any pain medication. He was diagnosed with bipolar disorder, for which he was prescribed medication, and Bricker was advised to wear a wrist brace for his left elbow and take an anti-inflammatory as needed.

On February 28, 2007, Bricker returned to Dr. Leavitt with complaints of headaches, right shoulder pain, low back pain, and left elbow pain. Bricker stated he was not taking any pain medication. Dr. Leavitt diagnosed fibromyalgia, right biceps tendinitis, and left lateral

epicondylitis. On June 20, 2007, Bricker reported that his depression was improved on his anti-depressant medication but he felt like he was craving alcohol worse than before and was also having racing thoughts and paranoia. Dr. Leavitt diagnosed alcoholism, depression, and high blood pressure, prescribing medications to help with the alcohol cravings.

On July 12, 2007, Bricker was evaluated by Dr. David Van Pelt, a psychologist, on referral by his caseworker at the Family Support Division of the Missouri Department of Social Services. At that time, Bricker reported having homicidal ideation, suicidal ideation, and mood swings. Bricker stated that while he initially sought assistance for his back problems, the psychological problems were more of an issue now than the back problems. Bricker stated his activities included fishing, camping, and mowing the lawn. Upon a mental status evaluation, Dr. Van Pelt noted that Bricker's attention, concentration, and memory were adequately functioning. Dr. Van Pelt noted average intellectual intelligence and that Bricker's judgment and insight were somewhat impaired and his overall impulse control was fair to poor. He diagnosed Alcohol Dependence and Malingering, the intentional production of false or grossly exaggerated physical or psychological symptoms, which Dr. Van Pelt opined was motivated by incentive to obtain financial compensation. Dr. Van Pelt assessed a GAF score of 69. Dr. Van Pelt stated the results of the personality measure were indicative of non-credibility and raised questions about Bricker's genuineness of response pattern throughout the psychological evaluation process. Dr. Van Pelt opined that Bricker's perceived emotional disturbance was not of the severity or magnitude to preclude him from working. Dr. Van Pelt stated that Bricker was strongly encouraged to seek medical

treatment, psychotherapeutic intervention, and addiction treatment.

On July 25, 2007, Bricker was seen by Dr. Leavitt for breathing difficulties and diagnosed with acute bronchitis with bronchospasm. On August 21, 2007, he reported that he was still having mild wheezing and dyspnea, in addition to chest pain. The chest pain continued, and Bricker had a stress test on August 28, 2007, which was negative. Dr. Leavitt diagnosed chronic bronchitis on September 18, 2007, and prescribed medication. When Dr. Leavitt saw Bricker again on December 11, 2007, for a contusion on his right great toe, he noted Bricker was still having chest pains. Bricker did not report elbow or back pain during these visits and Dr. Leavitt did not diagnose or treat such pain.

On July 7, 2008, Dr. Eva Wilson completed a Medical Source Statement-Mental in which she opined that Bricker was moderately limited in the ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals or make plans independently of others.

Dr. Wilson further opined that Bricker was not significantly limited in his ability to remember locations and work·like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make

simple work related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. Bricker was not markedly limited in any category. It was noted on the form that Dr. Wilson excluded from consideration all limitations she believed resulted from conscious malingering of symptoms and alcoholism. This report was made by Dr. Wilson nearly two years after she met Bricker for two occasions and she did not see him for purposes of filling out the report.

### A. Bricker's Testimony

On June 19, 2008, Bricker appeared in front of Administrative Law Judge L. W. Henry. When questioned by the ALJ, Bricker stated that he could not work due to severe back pain and social anxiety. Bricker testified that he has constant stabbing pain in his lower back radiating into his left hip and upper left leg, that he needs to lay down every hour and a half to two hours to relieve the pain, and that he has pain in his neck, shoulders, and elbows as well. He stated that after a few minutes of using his hands and arms, he gets pain in his forearms and his hands go numb. He also has severe headaches about once a week and shortness of breath related to his chronic bronchitis. In addition to his physical problems, Bricker stated that he has had problems with anger and getting along with other people which

has caused him to lose jobs in the past. Bricker testified he is unable to concentrate because his mind wanders and he has problems with anxiety whenever there are too many people or too much going on.

Bricker admitted that he did not receive treatment from a mental health professional on a consistent basis and that he was not taking any medications for his mental health. He further testified that he was not on any pain medications and that he treated his back pain with ice packs, heat pads, and Tylenol. With regard to his functional abilities, Bricker testified that he could walk without resting for one-quarter of a mile. His daily activities included getting his children ready for school, light housework, light yard work, watching television, and preparing some meals.

### C.   Medical Expert Testimony

At the end of the July 2008 hearing, the ALJ determined that it would be necessary to have a supplemental hearing with a rheumatologist medical expert. Hannon Christopher Alexander, III, M.D., a medical expert testified at a supplemental hearing on September 11, 2008. Dr. Alexander opined that Bricker had severe impairments, but none that met or equaled a listed impairment.

He opined that Bricker could lift and carry 20 pounds occasionally and 10 pounds frequently, and he did not believe Bricker would have any limitations sitting, standing, or walking in 6 out of 8 hours per day, with a sit or stand option. When the ALJ questioned Dr. Alexander regarding the sit and stand option, he stated that Bricker did not need to walk around and should be able to maintain a posture for 20 or 25 minutes. Dr. Alexander opined

that there would be some functional limitations, including an inability to sustain gross handling and gripping with his left hand, but Bricker could perform those manipulations on an occasional basis. He opined that Bricker should avoid unprotected heights and moving machinery.

### B. The Vocational Expert's Testimony

The ALJ heard testimony from a vocational expert ("VE"), Terri Crawford, at the supplemental hearing in September 2008. The VE testified at the supplemental hearing in response to a hypothetical question posed by the ALJ, outlining Bricker's age, education, and work experience. The hypothetical individual could lift, carry, push, and pull 20 pounds frequently and 10 pounds occasionally, and sit, stand, and walk for 6 out of 8 hours, with the ability to alternate between sitting and standing in the immediate workstation every 20 to 25 minutes. The individual could never climb ladders, ropes or scaffolds, but could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. The individual could not sustain gross handling and gripping with the non-dominant left hand, and could not work around moving machinery or unprotected heights. The individual was limited to simple tasks and limited social contact situations.

Considering the exertional and non-exertional limitations described by the ALJ, the vocational expert testified that the hypothetical person could perform the occupation of gate guard with 1,300 jobs in Missouri, 75,000 jobs in the United States.

### II. The ALJ's Decision

ALJs evaluate disability claims through a five-step process:

The claimant must show he is not engaging in substantial gainful activity and that he has a severe impairment. Those are steps one and two. Consideration must then be given, at step three, to whether the claimant meets or equals [an impairment listed in the regulations]. Step four concerns whether the claimant can perform his past relevant work; if not, at step five, the ALJ determines whether jobs the claimant can perform exist in significant numbers.

*Combs v. Astrue*, 243 Fed. Appx. 200, 202 (8th Cir. 2007) (citing SSR 86-8, 20 C.F.R. §§ 404.1520, 416.920).

After describing this process, the ALJ found that Bricker was not disabled. At step one, he determined that Bricker was not engaging in substantial gainful activity since November 1, 2004.

At step two, the ALJ determined Bricker was severely impaired by degenerative disc disease with back and radicular hip pain, fibromyalagia syndrome, left epicondylitis, and bipolar affective disorder with history of obsessive-compulsive disorder.

At step three, the ALJ determined that Bricker did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

At step four, the ALJ found that Bricker has the residual functional capacity to perform a wide range of light work. The ALJ noted Bricker testified he experienced severe back pain and social anxiety, depression and difficulty concentrating. Additionally, the ALJ noted Bricker's testimony that he is unable to lift and carry heavy objects or to stand and walk for prolonged periods of time.

While stating that Bricker's medically determinable impairments could cause these symptoms, the ALJ found that Bricker's statements concerning intensity, persistence and

limiting effects of those symptoms were not credible. The ALJ noted that Bricker's self-reported daily living activities are inconsistent with such allegations of debilitation. The ALJ noted Bricker's work record with a sporadic work history, frequent job changes and no substantial earnings even before the alleged onset of disability.

The ALJ also commented on the medical opinions of record. The ALJ noted that the clinical and objective findings were inconsistent with Bricker's allegations of total debilitation. The ALJ noted that the record indicates that Bricker continues to move about on a regular basis. Moreover, the ALJ noted that there is no diagnostic evidence to substantiate Bricker's complaints of debilitating pain.

The ALJ noted that Bricker's treating physicians did not support his mental health allegations, discounting the opinion of Dr. Wilson because she had only seen Bricker two times and did not review any subsequent medical documents or see Bricker in person before issuing her medical source opinion. The ALJ found that her opinion was greatly outweighed by that of Drs. Forsyth, Lampert and Van Pelt.

At the fifth step, the ALJ considered the testimony of the VE. He stated that the VE testified that a person of Bricker's education, past work experience, and residual functional capacity would be able to perform work as a gate guard which exists in significant numbers in the national economy. Therefore, the ALJ found that Bricker was not disabled.

## III.  *Standard of Review*

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*,

477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007). "On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied." *Strom v. Astrue*, No. 07-150, 2009 WL 583690, at *22 (8th Cir. Mar. 3, 2008) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choices." *See Casey v. Astrue*, No. 06-3841, 2007 WL 2873647, at * 1 (8th Cir. Oct. 4, 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

It is well-established that the ALJ carries the duty of fully and fairly developing the record. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). This is true even where a claimant is represented by counsel. *Id.*

## IV.  Discussion

Bricker argues that the ALJ erred because (1) the ALJ did not properly evaluate the opinions of treating medical sources; (2) the ALJ did not provide a proper RFC evaluation; and (3) the ALJ's decision at step 5 of the sequential process was not based upon substantial evidence.  This Court finds no reversible error in the ALJ's decision.

### A.    The ALJ Gave Proper Weight to Treating Medical Sources

With regard to his alleged mental disorder, Bricker disagrees with the ALJ's

conclusion that the opinion of psychologist Dr. Eva Wilson did not deserve weight. Dr. Wilson's opinion was not entitled to controlling weight, and the ALJ considered her opinion in accordance with the record as a whole. *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007); *Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998). "The ALJ is charged with the responsibility of resolving conflicts among medical opinions." *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008).

In addition to the short treatment relationship, Dr. Wilson's notes did not support her opinion in the medical source statement. Her two pages of handwritten notes summarized Bricker's subjective complaints and his reports of prior diagnoses and medications. Her summary of her second visit with Bricker was only one sentence. Her notes were devoid of any clinical evaluation, impressions, or conclusions. Although Dr. Wilson stated that her medical source opinion excluded all limitations she believed resulted from conscious malingering of symptoms and alcoholism, she did not have the benefit of the Dr. Van Pelt's psychological evaluation results indicating the severity of Bricker's malingering or any other medical documents in the intervening time since she first treated Bricker.

The ALJ properly evaluated Dr. Wilson's opinion. He reasoned that Dr. Wilson was not a treating physician because she saw Bricker only twice and those visits occurred two years before she completed the medical source statement. Moreover, Dr. Wilson was not a "treating source" as defined by 20 C.F.R. §§ 404.1527 and 416.927. In order to be considered a treating source, the physician must have seen the claimant "a number of times and long enough to have obtained a longitudinal picture of the claimant's impairment,"

taking into consideration "the treatment the source has provided" and "the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." 20 C.F.R. §§ 404.1527 and 416.927. Here, Dr. Wilson saw Bricker only twice. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (explaining that the physician's opinion was not entitled to controlling weight as a medical opinion of a treating source because the physician had only seen claimant on three prior occasions).

Based on the record as a whole, the ALJ properly concluded that Bricker's treating physicians did not support his allegations. Dr. J. Forsyth tentatively diagnosed a mental disorder when he first saw Bricker and referred him to a psychologist. Although Dr. R. Forsyth, a psychologist who saw Bricker on one occasion, found severe mental impairments, he suggested the possibility of substance abuse as another diagnosis. He also noted Bricker's self-report was contradictory. In his mental status examination, Dr. R. Forsyth noted Bricker showed clear, coherent and goal directed speech, and was cooperative and showed adequate effort in completing the assessment process. Dr. R. Forsyth noted that Bricker showed manic tendencies, obsessive compulsive behavior and thoughts, and indications of helplessness and hopelessness. Dr. R. Forsyth stated the results of mental functioning assessments were within or above normal limits with the exception of memory difficulties.

When Bricker saw Dr. Lampert, a pain management specialist, he stated that Bricker's short-term memory and higher cognitive functions appeared to be intact. Dr. Lampert administered epidural steroid injections and other pain modalities, with little improvement, and referred Bricker to a psychologist for presurgical counseling. Dr. Lampert noted

Bricker's mood and affect were appropriate.

Dr. Van Pelt performed psychological testing that provided strong evidence of malingering. Upon a mental status evaluation, Dr. Van Pelt noted that Bricker's attention, concentration, and memory were adequately functioning. He diagnosed Alcohol Dependence and Malingering, the intentional production of false or grossly exaggerated physical or psychological symptoms, which Dr. Van Pelt opined was motivated by incentive to obtain financial compensation. Dr. Van Pelt stated the results of the personality measure were indicative of non-credibility and raised questions about Bricker's genuineness of response pattern throughout the psychological evaluation process. Dr. Van Pelt opined that Bricker's perceived emotional disturbance was not of the severity or magnitude to preclude him from working.

The Court concludes that there is substantial evidence in the record to support the ALJ's determination that Dr. Wilson's opinion was greatly outweighed by Dr. J. Forsyth, Dr. Lampert, and Dr. Van Pelt.

B.     The ALJ Properly Determined Bricker's RFC

Bricker argues that the ALJ failed to fully consider the medical evidence regarding both his physical and mental impairments. After reviewing all the evidence and weighing the medical opinions of record, the ALJ formulated Bricker's RFC. An ALJ has the duty to formulate the RFC based on all the relevant, credible evidence of record. *See McGivney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). In this case, the ALJ determined Bricker retained the RFC to perform a wide range of light work. He could lift and carry 20 pounds

occasionally and 10 pounds frequently; sit, stand, or walk 6 hours in an 8-hour work day; and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. He could not climb ladders, ropes, or scaffolds, and should avoid exposure to hazards such as moving machinery and dangerous heights. Due to his mental impairments, the ALJ found that Bricker had moderate limitations in the ability to understand, remember, and carry out detailed instructions, and moderate limitations in the ability to interact appropriately with the general public.

Bricker argues his RFC does not include sufficient restrictions related to his severe limitations. However, the ALJ's decision is supported by substantial evidence on the record as a whole.

### 1.    Mental Impairments

Bricker argues the ALJ improperly excluded Dr. Wilson's opinion as to his alleged limitations from the RFC. However, an ALJ need include only those limitations found to be credible in formulating the RFC. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). Because the ALJ found Dr. Wilson's opinion to be greatly outweighed by other evidence, he properly excluded her opinion as to Bricker's alleged limitations in the RFC.

Bricker argues the ALJ erred finding only moderate limitations in the ability to understand, remember, and carry out detailed instructions, and moderate limitations in the ability to interact appropriately with the general public. In addition, Bricker argues the ALJ failed to consider Dr. R. Forsyth's opinion that Bricker suffered from manic tendencies, racing thoughts, attention and concentration problems, obsessive compulsive behavior and

thoughts, and difficulties with mental focus. Dr. R. Forsyth's notes from his single evaluation were not consistent with the evidence as a whole. No treating physician or psychologist reported any difficulties with Bricker's alleged diminished memory or concentration. Dr. Lampert stated that Bricker's short-term memory and higher cognitive functions appeared to be intact.

Moreover, Bricker testified that he did not receive treatment from a mental health professional on a consistent basis. He also testified that he was not taking any medications for his mental health. Dr. Van Pelt diagnosed Bricker as a malingerer. The ALJ found that Bricker had mild restrictions in activities of daily living, moderate difficulties in social functioning, mild difficulties in concentration, persistence or pace, and one to two episodes of decompensation. He noted that Bricker testified he was able to manage his own affairs and care for his personal needs and found no evidence that Bricker's current activities of daily living differed significantly from those he was able to perform on and prior to his alleged onset date of disability.

The ALJ also recognized that Bricker was hospitalized after a suicide attempt related to alcohol intoxication and running out of his prescribed antidepressant. Accounting for these limitations, the ALJ determined in formulating his RFC that Bricker had moderate limitations in his ability to understand, remember, and carry out detailed instructions, and to interact appropriately with the general public. While some limitation was warranted, further limitations were not found to be credible by the ALJ. Thus, the ALJ's finding is supported by substantial evidence on the record as a whole.

## 2.        Physical Impairments

Although Bricker primarily argues that the ALJ failed to properly assess his mental functioning abilities, he also alternatively argues that the ALJ failed to properly` assess his physical impairments.  Bricker argues the ALJ failed to consider the opinion of Dr. Alexander, the non-treating, non-examining medical expert who testified at his supplemental hearing and stated that, due to epicondylitis, Bricker would be unable to sustain gross handling and gripping with his left hand and would be limited to performing these activities on an occasional basis.  The ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole.  *See Estes v. Barnhart*, 275 F. 3d 722, 725 (8th Cir. 2002).

The testimony of Dr. Alexander conflicted with the other medical evidence regarding Bricker's epicondylitis.  No treating or examining physician ever limited Bricker's movements with his left arm.  Dr. J. Forsyth repeatedly found Bricker's arms were normal.  Dr. Khoshyomn noted Bricker's motor and sensory function in his arms and legs were completely intact.  Dr. J. Forsyth noted Bricker's tennis elbow had improved.  Dr. Leavitt advised Bricker to wear a wrist brace and take medication as needed for any pain.  Bricker received two injections into his left elbow and reported improvement.  He did not seek further treatment after the injection in July 2006.

Bricker has acknowledged that his pain was mostly emotional and not really of a physical nature.  He frequently stated to his doctors, and during his administrative hearing, that he was not taking any prescription pain medication.  He testified at his hearing that he

used Tylenol, head pads, and ice packs to relieve pain. The use of over-the-counter pain medications and other conservative treatments is inconsistent with an allegation of disability. *See Loving v. Dep't of Health & Human Servs.*, 16 F.3d 967, 971 (8th Cir. 1994) (concluding that over-the-counter medication was inconsistent with complaints of disabling pain).

Additionally, during several appointments with Dr. Leavitt, after February 2007, Bricker did not mention pain in his elbow. The ALJ was justified in not including any manipulative limitations in Bricker's RFC.

Bricker also argues the ALJ ignored Dr. Alexander's opinion that Bricker would need to alternate sitting and standing every 20 to 25 minutes. Because Dr. Alexander's opinion regarding Bricker's need for a sit and stand option was inconsistent with the medical record as a whole, the ALJ was free to reject that portion of his opinion. *See Estes v. Barnhart*, 275 F. 3d 722, 725 (8th Cir. 2002). No other physician stated that Bricker had such a limitation, nor do Bricker's daily activities, testimony, or self-reports reflect such a limitation. Bricker testified during the hearing that he would need to change positions every one and one-half to two hours. Further, the ALJ posed a hypothetical question to the VE that included the sit and stand option and the expert opined that Bricker would be able to perform the position of gate guard.

Thus, even if the ALJ had included the sit and stand option in Bricker's RFC, he would have been justified in relying on the VE's testimony that there was other work Bricker could perform, and his finding of no disability would be supported by substantial evidence. Accordingly, the Court concludes that the ALJ's formulation of Bricker' RFC was supported

by substantial evidence on the record as a whole.

### C. The ALJ Properly Determined Bricker Could Perform Other Work

Bricker argues that the ALJ's determination of other work he could perform at step 5 of the sequential process is unsupported in this case. Finding that Bricker had no past relevant work, the ALJ recognized that, at step five of the sequential evaluation process, the burden shifts to the Commissioner to show "other work" Bricker could perform. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). This burden is satisfied through the testimony of a VE. *See* 20 C.F.R. §§ 404.1566(e) and 416.966(e).

The ALJ solicited the testimony of a VE to determine that Bricker could perform other work in the national economy. The ALJ posed a hypothetical question to the VE that included all of the limitations of his RFC, and additional limitations that were not ultimately included in the ALJ's determination of Bricker's RFC. The VE testified that Bricker could perform light, unskilled work, such as the occupation of gate guard which had 1,300 jobs in Missouri, 75,000 jobs in the United States.

Bricker opposes the VE's testimony and argues that because the gate guard position is listed with a reasoning level of three, it is inconsistent with the ALJ's RFC finding that Bricker would have moderate limitations in understanding, remembering, and carrying out detailed instructions. The gate guard position is listed in the Dictionary of Occupational Titles (DOT) as a position of specific vocational preparation (SVP) level three, which has been classified in the regulations as semi-skilled work, 20 C.F.R. §§ 404.1568 and 416.968; SSR 00-4p. However, the VE acknowledged that while the gate guard position was listed

23

in the DOT as light, semi-skilled work, she had figures for the light, unskilled position, and provided those numbers to the ALJ at the hearing. Thus, because the vocational expert provided numbers for the unskilled gate guard position consistent with the limitations in the ALJ's RFC, the conflict between the DOT and the ALJ's RFC was addressed and appropriately resolved.

Bricker next argues that the ALJ relied upon testimony elicited from the VE in response to a RFC that substantially differed from that set forth in his decision. While the RFC cannot contain greater limitations than those included in the hypothetical presented to the vocational expert, the ALJ can present a hypothetical with greater limitations than he eventually includes in his RFC. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001). A hypothetical must set forth with reasonable precision all of those impairments and limitations found to be credible by the ALJ. *See Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998). Here, the ALJ's hypothetical to the VE at the supplemental hearing contained not only those limitations included in the RFC, but additional limitations that the ALJ ultimately found to be not credible and thus excluded from Bricker's RFC.

Bricker next argues that the ALJ failed to meet the burden of showing that work existed in significant numbers in the national economy because the vocational expert did not provide numerous representative occupations. Bricker argues that one "job" is insufficient to satisfy the Commissioner's burden. However, the regulation differentiates between "jobs" and "occupations," and provides that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the

claimant is] able to meet." 20 C.F.R. §§ 404.1566(b) and 416.966(b); *see Weiler v. Apfel*, 179 F.3d 1107, 1110-11 (8th Cir. 1999). Thus, the position of gate guard, although only one occupation, satisfies the requirements of the regulation to demonstrate work in a significant number of jobs. The vocational expert found that there were 1,300 jobs regionally and 75,000 jobs nationally in the occupation of gate guard. The ALJ found that this constituted a significant number of jobs.

Moreover, this determination is left to the common sense of the ALJ. *See Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) ("[I]n determining whether work exists in significant numbers, . . . [t]he decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." (quotation omitted)). Courts have been reluctant to specify a specific number as significant. Numerous court cases have found significant numbers based on a number of jobs far smaller than in this case. *See e.g.*, *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (200 jobs in Iowa was a significant number); *Jenkins v. Bowen*, 861 F.2d at 1087 (500 jobs was a significant number of jobs).

Finally, Bricker argues that the VE testified that an individual with the limitations opined by Dr. Wilson would not be able to perform any work. However, the Court has already determined that the ALJ properly discredited Dr. Wilson's testimony. Thus, the ALJ properly disregarded these unsubstantiated restrictions. *See Johnson v. Apfel*, 240 F.3d at 1148.

The ALJ was justified in relying on the vocational expert's testimony as substantial

evidence in finding Bricker not disabled. *See* 20 C.F.R. §§ 404.1566(e) and 416.966(e). As the vocational expert's testimony constitutes substantial evidence and is supported by the record as a whole, the ALJ met the Commissioner's burden of showing that there are a significant number of jobs in the national economy that an individual with Bricker's impairments, symptoms, and limitations could perform.

**V.     Conclusion**

Because this Court finds no reversible error in the ALJ's decision, Bricker's Complaint [Doc. # 3] is DENIED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 26, 2010
Jefferson City, Missouri